18-60079 Okay, the next case of the morning is Clean Water Action et al. v. U.S. EPA 18-60079. Sorry about this, we'll hear first from Mr. Gerhardt. Good morning, may it please the Court, I'm Matthew Gerhardt representing the petitioners. This case is about EPA's unlawful postponement of compliance with the limits set in 2015 on toxic wastewater discharges from power plants, which are the largest industrial source of toxic water pollution in the country. EPA postponed compliance with 2015 limits on two waste streams, bottom ash and scrubber wastewater, solely because of EPA's intent to reconsider those limits in the future. But no statute authorizes EPA to postpone compliance with a final effluent limit solely  And this Court should reject EPA's invitation to expand the power of a federal agency beyond what Congress has actually written into statute. Let me ask you a question. How do you accomplish the revision power that EPA has if EPA is not entitled to say to the regulated parties, you need not comply while we are in the process of revision? Your Honor, I'm not aware of any environmental statute which has granted EPA authority to pause compliance because of a reconsideration proceeding for two years. So that's a judgment that Congress This was a rulemaking, notice and comment rule, and that EPA based on its power to revise. Your Honor, the problem here is that EPA didn't actually engage in a revision in this rulemaking. So would you rather, so if EPA had in this rulemaking said the cost of compliance of this is close to 500 million a year, and the parties are telling us that there is no technology that can actually achieve this, this diminution of these, in these two wastewater streams without putting, putting our plants out of business and all the collateral consequences that that makes, and EPA did not have the data that formulate this conclusion in advance, it couldn't do it. Your Honor, EPA absolutely possesses the discretion to make the finding you just mentioned. The crux of the problem with EPA's rule is that it didn't make the They could repeal the whole rule. They could if they went through the statutory process. But I guess what I'm saying is since the rule only came into, only became a rule in 2015, setting dates of compliance way out in the future, had EPA come in in 2017, curiously coincident with the change of administrations, and said we would, we revoke that rule, you would be arguing that that was arbitrary and capricious, would you not? Your Honor, yes, in part because we submitted evidence in the record that it, that facilities were starting to comply. So, well, I mean, the problem is this. From the standpoint of rational management of an agency and the parties that are under regulation, if there have been presented strong reasons why a rule ought to be subject to reconsideration and the agency evaluates those and doesn't reconsider, it says, hmm, we need to think about two out of seven streams. We need to think about compliance, the first early compliance date, not the farthest out compliance date. Why is that arbitrary and capricious? Because Congress didn't give EPA that authority and hasn't given EPA that authority in any environmental statute. So basically, the EPA, all of the EPA, suppose that all of these, suppose that in the interim between the enactment of a rule and the effective date, some surprising new technology has come along that can magically transform these wastes into something recyclable or whatever. So you're saying EPA could not tell the regulated parties, you need not invest four or five hundred million dollars a year because there's this new technology that will be much more fit, they could, everybody has to march forward in marginet-like lockstep, right? Is that your position? No, Your Honor, I apologize, perhaps I'm not conveying our position clearly here. There's a distinction between pausing compliance with the rule and revising it. I believe you're asking about- But they revised. If you go back to revision, you have to then go back to the basic requirements for rulemaking itself and what would that entail here? In other words, in response to the difficulty that Judge Jones poses. Well, Your Honor, as Judge Jones was discussing, there are six listed factors in the statute that EPA- I know what's the answer to my question. Yes, and so EPA has to consider and make findings on each of those six factors. And what would that entail? So that entails considering all of the relevant evidence in the record on those six factors. And the problem here is that EPA expressly said it wasn't making those findings. And I understand your argument that the Clean Air Act does grant them that authority. But in response to the question, which I think is a strong issue in terms of practicality, you argue that they should have- that this is not a- that you really are trying to effect a- you could go back and revise, but if you're going to do a revision, which you argue this is not, and you argue it's not because you did not comply with the requirement for revision, which is that you go back and, in essence, gauge for the prerequisite steps for the rule itself. Okay, fine. What does that take in terms of- how does that respond to the difficulty of a sudden- of changing conditions? Your Honor, EPA would need to consider all of the evidence in the record on those- on those factors in terms of the technologies available for meeting the limits, the process for meeting those limits, and the cost. And here EPA said, we have all this new evidence on those factors. We're not going to make findings on that evidence because we're going to do so in the future. That's not a revision. That's EPA saying in the future we'll revise the limits, but here we're not. They're not saying they're going to revise or not revise. And, in fact, they specifically said we are maintaining the limits on waste streams, which another panel of our court, as you very well know, recently upheld. We are maintaining the end date of 23, 2023. We are just changing for two years because we are going to look at this until no later than November of 2020. Your Honor- So aren't you confusing what you're predicting is the- is the end result with a rational agency process that they articulate on the basis of new factor- new findings? Your Honor, it's not rational for at least two reasons. One, EPA in its brief concedes the Clean Water Act doesn't authorize the agency to stay in compliance with a final effluent limit. Secondly, the Clean Water Act requires EPA to review and revise every effluent limit every five years. So, the notion that EPA can pause compliance simply because a few years in the future it's going to review those effluent limits is absolutely incompatible with the statute because it's always true that for every limit, EPA is reviewing that limit a few years down the road. So, Congress can't possibly have intended for EPA to have the authority to stay a final effluent limit when it's going to review them a few years in the future because EPA is always supposed to be in that situation. Let me- let me ask you because I've been quite confused about this. As I understand it, the structure of the Clean Water Act was to impose best practicable technology then best available technology and the- and the BAT limits on these waste streams were fixed in 1982, correct? And then in 2005, it wasn't until 2005, 23 years later, that a rulemaking was begun to revise the- those limits, correct? And then it took EPA 10 more years to come up with a rule, correct? He's nodding his head. I'm sorry. Yes, you're on mute. That's correct. Okay. All right. And then EPA says- apparently acknowledges that there may be flaw- you know, uncertainty about the technology to achieve these proposed limits and so on, but my point is that between 1982 and today, the effluent limits have been the same and therefore, I wonder how your group has standing to assert injury. Your Honor, we submitted 19 standing declarations and I won't go into the detail of each particular one, but the general allegation of injury is that the 2015 rule would have required reductions in toxic water pollution from the two waste streams that issue here. Our members, my client's members, use the waterways where that- those toxins are discharged. I understand all that theory, but what I'm suggesting is you're- to me, this is getting toward the notion of taxpayer standing because where everybody is exposed, nobody is exposed and yet everybody has been exposed to the same level of effluents since 1982 and it is hard to say that because they may continue to be exposed to these two waste streams for two more years before a mandatory compliance date or a revision in accordance with a new rule that you have injury or even that you have a rational concern about injury when you've been exposed since 1982. Your Honor, let me respond to that in two ways. The first is that respectfully, I disagree that this is anything like taxpayer standing. Not every person in the country lives near and uses a waterway to which a power plant discharges toxins. Our standing declarations show that we have members that have property right on water fronts where toxic wastewater is discharged. So in that respect, it's completely different from taxpayer standing. Secondly, what changed in 2015 is that EPA set new best available technology limits that required reductions in toxic water pollution and EPA's delay in implementing that results in the injury here because but for this rule, our members would have benefited from reductions in toxic water pollution. Well, but the question is whether you can credibly assert that you are exposed to something or have a concern and I'm just referring to our decision in Texas Oil and Gas which points out that effluent guidelines or BAT guidelines are technology-based rather than harm-based. Your Honor, neither EPA nor the intervenors has challenged our standing here. Well, I know that but it is jurisdictional and I don't want to waste all your time. I do want to throw that red herring out though. Thank you, Your Honor. I would say that our standing here is based on similar allegations as in Southwestern Electric Power Company which this court just decided and for the same reasons we have had standing in that case, we have standing. But whether it's technology-driven or not doesn't really affect the consequences of injury and there are no period of limitations on injury. There may be a period of limitations where one could bring a lawsuit but injury could be going on for years. So I'm not sure if I'm followable. Well, Your Honor, the injury results from the fact that our members had expectations that the 2015 rule, once issued, would be implemented and reduce toxic water pollution. EPA's rule here is the but-for cause of delays and those reductions in toxic water pollution which means that our members continue to suffer injuries which would have been ameliorated had the 2015 rule gone into effect according to its original schedule. In the remaining minute I have here, I'd like to turn back to this distinction between pausing compliance and revising the rule. EPA absolutely has the discretion to revise effort limits. The problem, the crux of the case here is the fact that EPA did not in fact revise effort limits. It said in the future we might revise them and it expressly declined to make findings on the new evidence in the record that would be necessary to revise the effort limits. And I would direct the court to the last page of the response to comments. So what ultimate relief do you seek? What ultimately do you want the EPA to do? To implement the 2015 rule unless and until it changes that rule going through the statutory process. But, you know, the due date for that to begin compliance was like November of 2018. It's already passed. Right? Yes, Your Honor. It has already passed. So therefore companies are investing tens of millions of dollars per company, all of which the rate payers have to pay. So basically you're putting everybody in a position where EPA could not possibly revise the rule. Your Honor, it's not the case that EPA lacked options. If EPA had thought that there were actually an error here, it could have gone to the Fifth Circuit and requested a remand or a remand with vacater and industry here could have I never heard of that, where an agency has to seek court approval for remand to do something rational. I thought agencies had inherent power to do rational things. Your Honor, I would respectfully disagree that it's rational to delay compliance with a rule when EPA hasn't found any errors in that rule. In the proposed rule here, EPA expressly said we are conceding no error. So I would submit to you it's not rational to delay compliance with a rule when EPA concedes there's no error in that rule. Okay. You have a chance for rebuttal. Mr. Hoshijima. Good morning. May it please the court. Suki Hoshijima for the Environmental Protection Agency. EPA acted reasonably here to address a problem. And that problem was regulated entities having to take costly measures to comply with requirements that might soon change. To address that problem, EPA issued a partial revision of the effluent limitations in the 2015 rule. That partial revision was a permissible and reasonable exercise of EPA's Clean Water Act authority. I'll spend most of my time focusing on this authority issue since that's what the petitioner is focused on. So do you agree it has to be a revision? I know you think it was a revision. That's correct, Your Honor. This was a revision of effluent limitations. So you're not arguing there's an inherent stay power? No. And EPA was clear all along in the rulemaking record that it wasn't relying on any authority to stay a rule pending reconsideration, whether that authority was inherent, whether it was under the Clean Water Act or under the Administrative Procedure Act. It said in the rulemaking record, and that's in the comment response on Joint Appendix 1250, that the authorities for the postponement rule rests on the same authorities as the 2015 ELG rule. And that authority was the authority to promulgate and to revise effluent limitations and pretreatment standards under the Clean Water Act. And as the Court noted, EPA undertook full notice and comment rulemaking to exercise that authority. And so the question here isn't about whether EPA identified a proper source of statutory authority. Now, petitioners are saying that EPA can't use that authority in a way that's functionally a stay pending reconsideration. But petitioners can't point to anywhere in the text of the statute that says that EPA's general authority to revise effluent limitations is limited in that way. Now, petitioners are trying to find an implied limitation, and they're trying to find this implied limitation based on the absence of any specific authority to EPA to stay a rule pending reconsideration. But that doesn't make sense here to imply a limit on what's a general authority for EPA based on the absence of a more specific authority here. Petitioners really rely on the Clean Air Act for that argument, but the Clean Air Act is different. Because there, the Airlines Houston case reasoned that because there was a specific provision about a stay pending reconsideration, that EPA can't use its general authority to revise effluent limitations in a way that circumvents that specific authority. That rationale doesn't apply here because there is no such specific provision in the Clean Water Act. But doesn't that make it a tougher case for the EPA? I mean, the Clean Air Act gives the stay authority. It's limited to a short time period, and even their courts have held you can't circumvent that limitation. And here, there's no authority at all to stay under the statute, and you're arguing they have greater authority to, the agency has greater authority to do that. A couple points. First is that in the Clean Air Act, the rationale is that you can't circumvent a specific provision that might limit the EPA's authority. Here, there is no specific provision. All there is is a general provision, and so it doesn't make sense to imply a limit based on the absence of any specific provision. I would also notice a second point, that that particular provision of the Clean Air Act doesn't have any application here. That section, which is section 7607D7B, is actually about a limitation on judicial review for comments that weren't raised during the rulemaking process. And if you read on that provision, it says that the administrator is required to provide mandatory reconsideration in cases where it was impracticable to raise a comment during rulemaking. And during such reconsideration, EPA is permitted to postpone the effectiveness of a date for a certain period of time. Now that provision, it doesn't have any application here because it's referring to a particular kind of reconsideration, the mandatory reconsideration under those specific circumstances there. Those circumstances don't apply here, and so it doesn't make sense to say that the absence of a provision like that in the Clean Water Act is the reason to read any kind of implied limit on express authority that the statute grants to EPA. I'd like to go on to just explain briefly what EPA did. What are the impediments to the EPA simply engaging in a revision of the rule? Well, EPA did revise the rule now, and EPA said that it might also revise the rule again in the future based on additional fact-finding in response to the administrative petitions for reconsideration. I mean, with the revision, you can't just look at the revision in terms of two years for two streams of wastewater because the revision expressly declined to revise the end date and the effective date for five streams of waste, correct? That's correct. So it was a thoughtful reconsideration of the impact of the impending rule. That's right. It was a narrowly tailored revision of effluent limitations to address the fact that these petitions for reconsideration had raised what EPA determined were serious concerns about the affordability and achievability of the technology basis for the 2015 rule. And as Judge Jones pointed out, it's correct that EPA's revision was only partial. EPA kept in place all of the limitations for the waste streams that were not under reconsideration. Even for the two waste streams that were at issue in the reconsideration, EPA kept in place the general approach it took in the 2015 rule, which was that it would phase in the more stringent limitations at a future window of time. I mean, this is an editorial comment, but insofar as the BAT standards are supposed to be, quote, technology forcing, it seems to me that this particular revision remains technology forcing because at some point, EPA is going to have to decide, are we going to go forward with this or is there another BAT standard that will work? So everybody still has to work toward a BAT standard, right? That's correct. What the EPA did here was it kept the same numerical limit even for those more stringent limitations and kept the same backend date of 2023 by which all facilities would have to comply. All it changed here in the postponement rule by revising the prior rule was the earliest date on which a permitting authority could impose those limitations on a particular facility. I would note that this is a kind of incremental rulemaking that courts have recognized that agencies are entitled to do in the face of these practicalities that Judge Jones described earlier. This is a National Association of Broadcasters case cited on page 27 of our brief. In that case, the D.C. Circuit recognized that especially in times of changing technology, when the facts are in flux, agencies aren't required to deal with all of the issues at once. It would be paralyzed if it had to do so. Instead, agencies are allowed to engage in this kind of incremental rulemaking. Here what the agency did was it took the previous findings that it had made in the 2015 rule, and that entire record is contained in the record here, and did a cumulative add-on rulemaking that built onto that. It took those findings, held them steady, and then found that there was a new development under one of the factors. The other factors, as the administrator deems appropriate, and said that new development is this reconsideration and the serious concerns that were raised that spurred that reconsideration. Petitioners have never argued that it was improper for EPA to take that factor into consideration. They've never argued that EPA erred in giving too much weight to that factor. Did they argue that this new information about the costs and the availability of technology are unfounded? They did not. At least I don't understand them to be. I couldn't remember. I didn't think so. Right. EPA stated in the postponement rule that there were serious concerns about the availability of the technologies underlying the 2015 rule. Now it's possible that EPA does further fact-finding and finds that those serious concerns that it initially assessed aren't borne out. And it's possible that EPA does this reconsideration rulemaking and decides to leave everything in place. And that may be possible, but that leaves the more stringent limitations still kicking in at a date as soon as possible following 2020. And most importantly, those more stringent limitations would be met by 2023 under the postponement rule or even in the pre-postponement rule, 2015 rule. And so if EPA ultimately finds that the serious concerns aren't borne out, then we're still going to be meeting all of the more stringent limitations by the same back-end date. When is the projected date? I think sometime in 2020 for the next rule to issue? EPA stated in the rulemaking record that it was intending to finalize the reconsideration by fall 2020. And my understanding is that the agency is on track right now. Even though if it were not, this rule, the postponement is not tied to the length of the reconsideration rulemaking. EPA postponed the compliance dates by the fixed two-year period based on its assessment of how long the reconsideration was. When does the five-year requirement kick in, the requirement that every five years these be reconsidered? The permits have to be renewed every five years, right? The agency is required to reconsider effluent limitations every five years and effluent limitations every year under Section 1314. And EPA, under a continuous process, determines whether it needs to revise those effluent limitations. Why was it, just for background, that it took from 1982 to 2005 to decide to revise these BAT standards? I don't have a specific answer for that. The statute does require that EPA review the effluent limitations and effluent limitation guidelines periodically. But it doesn't require that there's a revision every five years or every year. The requirement is that EPA review those requirements. So then I assume they issued a notice of proposed rulemaking in 2005 and then ten years later came up with a rule? That's correct because there was a large data gathering exercise that had to happen as part of the fact-finding for the 2015 rule. The 2015 rule explains how there was an industry-wide survey sent out where EPA received responses from 700-some facilities. And there were also data collection activities that included sampling at sites, site visits, a lot of fact-finding that needed to take place to do the 2015 rule. And what EPA said here was there are serious concerns raised about the availability and affordability of the technology bases we relied on then, based on these petitions for reconsideration, including the new data contained in it. And that it took us a long time to do that before, and it will take us some time to evaluate the petitions for reconsideration this time around. But in the interim, it's going to take a step that it's permitted to take under the Clean Water Act, which is to revise the effluent limitations in a partial way to allow for the regulated entities to not have to undertake these costly compliance measures in the interim. Are there other examples you can point to of the EPA making this kind of rule, pending reconsideration? I don't have a specific example to point to here. But what I would say is that every statute is different, and every statute imposes different constraints on EPA's revision authority. So the question here is really whether EPA stayed within the constraints that the statute imposes for a revision of effluent limits. I agree that's the ultimate question. It seems to me if the concerns about practicality were – it demonstrates how much these concerns about practicality exist if EPA's – if this is novel or if EPA's done this in other situations under other statutes. I don't have a specific answer to that question. But again, I would point the Court to the National Association of Broadcasters case in the D.C. Circuit, which speaks generally to the principle that agencies are entitled to engage in incremental rulemaking. And Petitioner's reply brief doesn't respond to that. Well, don't you think the delay from 1982 to 2005 and then to 2015 is pretty incremental also? It might be, but in this case – In the sense that the agency determined that those technologies were not immediately available and achievable within the meaning of the Clean Water Act as of the effective date of the 2015 rule. And the reasoning for that was that it would take costly measures for facilities to upgrade and specifically to be able to do so in a way that's not disruptive to energy availability, such as during planned shutdown and maintenance activities. And that was the rationale of the 2015 rule. Okay. Thank you. Thank you. Mr. Johnson. Thank you, Your Honor. Harry Johnson on behalf of the Utility Water Act Group, which is representing industry in this case. I'd like to – I'm going to jump around a little bit, given my position in the argument. But first I'd like to talk about EPA's authority to revise as it did here. Petitioners are trying to impose upon EPA an obligation for some minimum level of revision when it undertakes its express authority under 1311D and 1314B to revise the effluent limitations and the effluent limitation guidelines. But when looking at what the statute actually says, it says that EPA shall review periodically and revise as appropriate. And that's precisely what the EPA did here. EPA was not required by the statute to revise everything or revise some substantial amount of the 2015 effluent limitation guidelines. It revised as appropriate, given that there was new information suggesting that for certain of these waste streams, the technology that had been prescribed simply did not work. And it's very expensive. And it makes absolutely no sense for a regulator to require these utilities, and by extension their rate payers, to install at a cost of hundreds of millions of dollars, technology that may not work. Under petitioner's theory, EPA was required by statute, despite no express authority to do so, to demand that the utilities install this technology at a cost of hundreds of millions of dollars. And if EPA's decision changed in light of the new information on reconsideration, tear out that technology and install a new technology. That is simply not rational, and I would suggest, Your Honors, that it would not be appropriate for EPA to have done that. This backs into Vermont Yankee, doesn't it? I think it does, Your Honor. This is what a rational regulator should do. What was done here was a two-step reconsideration. EPA did not simply accept industry's new information and revise the 2015 limitations. It said we're going to do this in stages we want to investigate. And the Southwestern Electric case that was just decided by one of your sister panels said that when new information, when there's information out there available to the agency, it demands inquiry. And that's precisely what EPA is doing here, and that is rational. In fact, we would submit it would have been irrational for EPA to have done anything else. I do want to address this argument that somehow the rule has been stayed. It has not been stayed. The rule remains in effect, both the technologies and the limits. Permitting authorities around the country are continuing to issue permits based on the rule as it exists. What they're doing is, as a general proposition, they're pushing out the compliance date to 2020 or as late as 2023. They're doing that so that if EPA changes the technology, utilities can go in and ask the permitting authority to revise their permits as appropriate. If that's true, the permitting authorities are already pushing that out, which they can still do under the old rule, how does this case really matter? It seems to me it's all going to depend on what EPA ends up doing in the 2020 rule if they issue by then. That's absolutely correct. Because even if the court were to say, you have to go back to the old rule, that allowed the permitting agencies to ensure compliance up to 2023. How much practical significance does this issue really have? It may not have much practical significance, but it injects an element of uncertainty. When a utility approaches a permitting authority, now the potential window of required compliance is as early as, I guess, whenever this court may rule or when the mandate might issue. But the real uncertainty is because the rule might be, I mean, is what's going to happen in 2020? Or maybe people have a strong prediction as to what's going to happen. Exactly, Your Honor. I would like very briefly in what time remains to address the statutory interpretation argument regarding the three-year compliance window. Your Honors, the statute as written can only be read one way, that by March 31, 1989, effluent limitations had to be issued, and they were here. The revision provisions provide for no compliance deadline. And as we've said in our brief, it would be inappropriate to put that kind of restriction on EPA's ability to prescribe a technology that may not be available within three years that may be available outside three years. I see that my time has expired. We ask that the petitions be denied. Thank you. Okay, Mr. Gerhart. Thank you, Your Honor. So I'd like to try to get through four points quickly. The first is, in response to Judge Costa's question, I believe this action is unprecedented. I'm not aware of any prior example of EPA staying a final test-available technology limit. There's been much discussion over whether EPA stayed the limits or revised them. And I'd like to bring this back to the record because EPA and interveners' arguments misrepresent the record. So at 82 Federal Register 19,006, EPA says that it intends to conduct notice and comment rulemaking to stay the compliance deadlines for the new, more stringent limitations. Those are EPA's exact words. With respect to what EPA's counsel just told you, that EPA reweighed its prior findings, as we note in our reply brief, there is no place in the record in which EPA says it is reweighing evidence on the six statutory factors. I urge the court to look through the record for any place where EPA says anything close to it reweighing the evidence. It doesn't. This is nothing more than an impermissible post-op rush. Didn't it have to reweigh something in order to decide that it was going to adhere to the limits, the time limits and substantive limits on five of the way streams and delay only two of the way streams and only for part of the time compliance procedures? Well, Your Honor, we're not challenging what EPA did with the other way streams. I bet you're not, because you just won your case on that. Yes, we're challenging. But I mean, EPA said, suppose EPA decided to delay those two. It would depend on what EPA actually did in terms of whether it followed the process and the substance for revising those standards. Did you get the drift of my Vermont Yankee question? Yes, Your Honor. And respectfully, I think this case has nothing to do with Vermont Yankee. That case was about whether a court can impose procedural requirements on an agency that are not in statute. Well, but Justice Scalia wrote about that, I think, in the FCC v. Fox case or no, no, maybe it was in USA. In one of them, I've read a bunch. If the statute allows the agency to revise guidelines as appropriate, and you're saying revising guidelines has to do with the substance, cannot touch the deadlines, then aren't you modifying the statute? Your Honor, no. Our position is that a revision entails both the substance and the deadlines. Well, don't we get into Chevron on that? No, Your Honor, because there's no Chevron-worthy interpretation that EPA has made of the statute here. And the statute is crystal clear. 1314b2b says EPA shall consider six listed factors. EPA said in its brief on page 27, we have deferred full consideration of those factors. That concession is fatal to EPA's argument, because EPA is saying, in some future rulemaking, we'll comply with the statute, but we don't think we have to comply with it here. EPA doesn't get to pick and choose which statutory factors it considers. It has to consider all of them, and this court just held that in Southwestern Electric Power Company. Well, don't you think they ought to consider the factors that are relevant to what they're trying to decide? Your Honor, in Southwestern Electric Power Company, this court just held that even when EPA considers an other factor, such as it did here, it must be consistent with the remainder of the statute. Here, the remainder of the statute specifies six listed factors. And then there were petitions. Then this is in a different posture, because there were petitions for reconsideration here, and EPA decided that those raised other factors, and EPA's rule or discussion of its rule in the Federal Register identifies other factors. You're saying there were no other factors? Nothing new was presented to EPA about the cost and availability of the technology here? Your Honor, the problem is that there was new evidence on both sides. Well, then they had the right to decide, didn't they? But, Your Honor, the crux of the issue here is that they didn't, in fact, decide here. EPA expressly says at 82 Federal Register 43,496 and 97 that the petitions for reconsideration have raised concerns, and that EPA is not resolving them here because it will do so in a future rulemaking. So, Your Honor, you're absolutely right. EPA could have resolved all of the new evidence and applied that to the statutory factors. But EPA didn't do that. It said it would do that in a future rulemaking. And the problem with that is that EPA has to make a decision based on the record that's actually before the agency, not based on some future record that the agency wishes it could develop. Okay. We have your argument. Thank you, Your Honor.